23-1247-cv
Tennenbaum Living Tr. v. GCDI S.A.

# United States Court of Appeals
## for the Second Circuit

August Term, 2024

(Argued: February 18, 2025          Decided: July 20, 2026)

Docket No. 23-1247-cv

_____

TENNENBAUM LIVING TRUST, MERKIN FAMILY FOUNDATION,

*Plaintiffs-Appellees*,

v.

GCDI S.A., FKA TGLT S.A.,

*Defendant-Appellant*,

THE BANK OF NEW YORK MELLON,

*Defendant.**

_____

Before:

LOHIER, *Chief Judge*, CABRANES and SULLIVAN, *Circuit Judges*.

GCDI S.A., an Argentine construction company, appeals from an August 14, 2023 judgment awarding damages to the Tennenbaum Living Trust and Merkin Family Foundation (collectively, the "Trusts") on a breach of contract claim under New York law.  GCDI's challenge arises from an indenture

---

\* The Clerk of Court is directed to amend the caption as set forth above.

agreement (the "Indenture") originally entered in August 2017, pursuant to which GCDI sold dollar-denominated convertible debt notes (the "Notes") to the Trusts and others as part of a campaign to raise much-needed capital. As finally amended on December 4, 2019, the Indenture authorized GCDI's Board of Directors to convert the Notes into equity if certain conditions were satisfied. Central to this appeal is a clause of the Indenture, Section 1301, authorizing the Board to determine, "absent manifest error," that the threshold conditions for so converting the Notes had been satisfied. In 2020 GCDI's Board determined, over the objections of the Trusts, that the conditions to convert the Notes were met. The Trusts sued GCDI for breach of contract, claiming that the Board's determination constituted a "manifest error" within the meaning of Section 1301 of the Indenture and as defined in *Matter of Hermance v. Bd. of Supervisors*, 71 N.Y. 481, 486 (1877). After a bench trial, the United States District Court for the Southern District of New York (Cronan, *J.*) ruled in favor of the Trusts after finding that the Board's determination violated Section 1301. **AFFIRMED**.

Judge Sullivan concurs in a separate opinion.

NATHANIEL E. MARMON (John F. Baughman, *on the brief*), Baughman Kroup Bosse PLLC, New York, NY, *for Plaintiffs-Appellees*.

VICTORIA ANN BRUNO, Womble Bond Dickinson (US) LLP, Washington, DC (Harry H. Rimm, Womble Bond Dickinson (US) LLP, New York, NY, *on the brief*), *for Defendant-Appellant*.

LOHIER, *Chief Judge*:

GCDI S.A., an Argentine construction company, appeals from an August 14, 2023 judgment awarding damages to the Tennenbaum Living Trust and Merkin Family Foundation (collectively, the "Trusts"), on a breach of contract claim under New York law. GCDI's challenge arises from an indenture

2

agreement (the "Indenture") originally entered in August 2017, pursuant to which GCDI sold dollar-denominated convertible debt notes (the "Notes") to the Trusts and others as part of a campaign to raise much-needed capital. As finally amended on December 4, 2019, the Indenture authorized GCDI's Board of Directors to convert the Notes into equity if certain conditions were satisfied. Central to this appeal is a clause of the amended Indenture, Section 1301, authorizing the Board to determine, "absent manifest error," that the threshold conditions for so converting the Notes had been satisfied. Joint App'x 1657–58.

In 2020 GCDI's Board determined, over the objections of the Trusts, that the conditions to convert the Notes had been satisfied. The Trusts sued GCDI for breach of contract, claiming that the Board's determination constituted a "manifest error" within the meaning of Section 1301 of the Indenture. Following a bench trial, the United States District Court for the Southern District of New York (Cronan, *J.*) ruled in favor of the Trusts after finding that the Board's determination violated Section 1301. GCDI appealed, and we now affirm.

## BACKGROUND

In 2019 GCDI's financial condition began to falter alongside the Argentine peso's depreciation in value. To restructure its financial liabilities and "rescue

3

the company," GCDI decided to offer newly issued preferred shares to reduce its liabilities in foreign currency and raise capital. Joint App'x 471. To do so, the company persuaded a substantial majority of noteholders to accept new preferred stock in exchange for extinguishing their notes.

In November 2019 GCDI announced it would issue two new classes of preferred equity. First was the Class A Offering, which involved the issuance of shares in exchange for cash or in-kind contributions. Second, a Class B Offering would issue shares in exchange for GCDI common stock, convertible notes, or entitlements to deferred interest. The same month, a majority of the noteholders approved amendments to the Indenture governing the Notes, effective December 2019, which we now consider on appeal. As amended, Section 1301 of the Indenture authorized a mandatory conversion of the Notes into GCDI's common stock under certain conditions, as follows:

> If [GCDI] proceeds with one or more public offerings . . . for its Common Shares (and/or other equity interests) . . . in which, cumulatively and in the aggregate for such offerings, at least U.S.$100,000,000 of its Common Shares (and/or other equity interests) are sold by [GCDI] (the 'Qualified Public Offering Threshold'), all Securities shall be, on the date on which the Qualified Public Offering Threshold is achieved and consummated, automatically converted into publicly-tradeable Common Shares . . . at the Conversion Price, adjusted to (and including as to any Shares issued as of) the date of the achievement and consummation of the Qualified Public Offering

4

Threshold (as determined in good faith by the Board of Directors, whose determination shall be conclusive *absent manifest error* and described in a Board Resolution).

Joint App'x 1657–58 (emphasis added, quotation marks omitted).

The issuance of new preferred shares went into effect under the Indenture in December 2019. GCDI issued 39,033,842 Class A Shares in exchange for approximately $15 million in cash and for real estate worth approximately $24 million. The company also issued 140,796,732 Class B Shares in exchange for approximately 500,000 American depositary shares representing GCDI's common stock, notes with a face value of approximately $128 million, and entitlements to approximately $11 million of deferred interest. GCDI thereby substantially increased the net equity on its balance sheet by a sum far exceeding $100 million, from an initial deficit of negative $53.2 million to $78.9 million.

Based principally on the balance-sheet increase, GCDI's Board declared that the company had achieved the Qualified Public Offering Threshold of $100 million. It accordingly approved the mandatory conversion of the Notes into Argentine peso-denominated equity. After confirming that the "total amount of the securities representing [GCDI's] capital stock issued cumulatively under the

5

Offer[ings] . . . exceeded the aggregate principal amount of US$ 100,000,000,"

GCDI ceased paying interest on the Notes.  Joint App'x 1780.

The Trusts seek to recover the unpaid interest allegedly owed to them as holders of the Notes.  They initially claimed that the Indenture was improperly amended, that the Board acted in bad faith, and that the Board's decision as to the Qualified Public Offering Threshold was manifestly erroneous.  The District Court dismissed the Trusts' first two claims relating to the amendment and bad faith.  Those claims are not before us on appeal.  As for the Trusts' remaining claim of manifest error, the District Court conducted a bench trial and found that the Board manifestly erred when it determined that the conditions in Section 1301 of the Indenture for a mandatory conversion of the Notes were achieved. It ruled that GCDI had breached the Indenture by halting interest payments on the Notes.

GCDI appealed.

## DISCUSSION

We review the District Court's findings of fact following a bench trial for clear error and its conclusions of law *de novo*.  *See Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 617–18 (2d Cir. 2006).  The question on appeal is whether the

6

District Court misapplied New York law when it found that GCDI's Board manifestly erred in determining that the conditions for the mandatory conversion of the Notes had been met. To answer that question, we rely principally on *Matter of Hermance v. Bd. of Supervisors*, 71 N.Y. 481 (1877), the seminal decision of the New York Court of Appeals relating to manifest error.

In *Hermance*, a New York statute authorized county boards of supervisors "to correct any manifest, clerical, or other error" in the tax assessments of local officials. *Id.* at 485 (quotation marks omitted). The Court of Appeals interpreted the statute's reference to "manifest . . . error" to mean that the state legislature "did not intend to subject all assessments to review . . . upon every question that could arise affecting its legality and propriety." *Id.* Correctly applied, the Court of Appeals explained, the manifest error standard prevents courts from second-guessing "all errors of judgment, errors of fact, errors of law, [and] jurisdictional questions" relating, in that case, to tax assessments. *Id.* The standard thus covers only those errors that were "manifest," meaning "open, palpable, and . . . incontrovertible," and "needing no evidence to make [them] more clear." *Id.* at 486; *see* Joint App'x 1795.

7

The parties do not dispute that *Hermance*'s manifest error standard extends beyond the New York statute and tax assessments at issue there to also apply to contracts and calculations of the sort at issue here. The equivalent of *Hermance*'s "assessment-roll or return" in this case consists of the Board's written determination and its noted calculations in arriving at that determination pursuant to Section 1301 of the Indenture. Under New York law, moreover, the Indenture must be interpreted to give effect to the parties' expressed intentions based on the plain meaning of the agreement's terms. *See Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244–45 (2014); *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94–95 (2d Cir. 2021). It is no surprise, then, that the Board's legal advisor relied on its own particular reading of the Indenture to conclude that the Board's determination nevertheless "should be found to have sufficient basis not to be manifestly erroneous." *See* Joint App'x 1746.

With this background in mind, the Trusts insist that the Board manifestly erred when it calculated the value of GCDI's equity sold as contemplated by the Indenture. Although GCDI, for its part, responds that the District Court misconceived the manifest error standard under New York law and *Hermance*, it agrees that "[m]anifest errors are . . . errors that are incontrovertible, which

8

means not open to interpretation or not open to question." Oral Arg. Tr. 5 (counsel for GCDI); *see Hermance*, 71 N.Y. at 486; *Sempra Energy Trading Corp. v. BP Prods. N. Am., Inc.*, 860 N.Y.S.2d 71, 72–73 (1st Dep't 2008). In our view, the Board's calculation constituted an error that is "incontrovertible." *Hermance*, 71 N.Y. at 486.

Recall that Section 1301 required that "at least U.S.$100,000,000 of . . . Common Shares (and/or other equity interests) [be] sold" in "public offerings" to trigger the mandatory conversion. Joint App'x 1657–58. This language plainly means that the value of the equity sold must be at least $100 million. In determining that this threshold was met, however, the Board relied on metrics—changes in shareholder equity on GCDI's balance sheet and the liquidation preferences of the new shares—that the Indenture never mentions or even contemplates and that could not rationally or objectively be regarded as measuring the actual value of the equity sold by GCDI as part of the debt-for-equity swap. *See Glob. Reinsurance Corp.*, 22 F.4th at 94. The value of shareholder equity that the Board adopted to trigger the mandatory conversion of the Notes measures only the change in the difference between the assets and liabilities on GCDI's balance sheet. GCDI accomplished the change primarily by

9

extinguishing debt, which resulted in a total increase in equity of approximately $132 million. But this figure has nothing to do with the actual value of the shares sold. Similarly, the liquidation preferences establish priority rights in a theoretical future liquidation but do not purport to measure the actual value of the new shares. For that matter, the Board expressly warned investors that GCDI might lack the assets to pay the full liquidation preference.

For these reasons, we agree with the District Court that the Board failed to measure what the Indenture's terms incontrovertibly (that is, without question) required: the value of equity sold. By relying on metrics that incontrovertibly failed to measure the value of the new shares, the Board committed an "evident, visible, plain, obvious," and "manifest" error.[1] *Hermance*, 71 N.Y. at 486.

GCDI likewise contends that the District Court erred by effectively re-writing the Indenture to proscribe how the Board determined the conversion threshold had been met. We are not persuaded. While the Indenture never

---

[1] Although it forms no part of our analysis of whether the Board manifestly erred under New York law, we cannot help but note the evidence before the Board that the actual value of the shares sold was in fact far less than $100 million. Indeed, while the Board's legal advisor ultimately counseled that the Board could determine that the $100 million threshold had been surpassed, the advisor acknowledged that "the post-closing value of the preferred stock on a[n] as-converted basis . . . was below U.S.$100 million." Joint App'x 1746.

specified a particular valuation methodology, it unambiguously required GCDI to sell "at least U.S.$100,000,000 of its Common Shares (and/or other equity interests)." Joint App'x 1657–58. This language incontrovertibly (to borrow a term) requires determining the value of equity interests sold, regardless of the specific methodology used to do so. As the District Court correctly concluded, the Board's determination constituted manifest error under New York law not because the Board failed to choose a particular valuation methodology but rather because it failed to value the shares as compelled by the Indenture's plain terms.

GCDI also argues that the District Court erred by improperly shifting the burden of proof to GCDI. We disagree. The Trusts met their evidentiary burden to prove breach of contract by presenting various methods of valuing the shares sold, all of which yielded a sum far less than $100 million. The District Court's observation that GCDI "presented no evidence affirmatively supporting the conclusion that the [s]hares were worth more than $100 million" did not signal that it had improperly shifted the burden to GCDI. Joint App'x 1820. It merely confirmed that the Trusts' evidence of manifest error stood unrebutted.

In nevertheless urging reversal of the District Court's judgment, GCDI also invites us to employ the equivalent of our Court's review of arbitration awards

11

for "manifest disregard of the law."  *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388–89 (2d Cir. 2003).  Under that standard, we limit our analysis of arbitration awards to "exceedingly rare instances where some egregious impropriety . . . is apparent," *id.* at 389, and where there exists not even a "barely colorable justification" for the award, *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004) (cleaned up).  Without more, we decline the invitation to analogize a standard developed long ago under New York law to a standard of review derived from the Federal Arbitration Act, a modern federal statute.

Alternatively, GCDI argues, evidence presented at trial that the Board engaged in "reasoning on which [it] could have justifiably rested [its] decision" should have prompted the District Court to defer to the Board's decision. *Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 383 (2d Cir. 2023) (quotation marks omitted).  In a similar vein, GCDI asserts, the District Court's acknowledgment that "the Board might conceivably have sought to use [GCDI's] balance sheet as a basis for valuing the Class B Shares," Joint App'x 1806, is impossible to square with its ultimate conclusion that the Board's decision was a manifest error.

12

We acknowledge the ambiguity in the District Court's statement about what the Board "might conceivably" have done. But we view the statement as consistent with the rest of the District Court's analysis. In particular, it comports with the District Court's finding that "the Board did not attempt to measure the dollar value of the [s]hares sold in the Offerings but instead measured the dollar value of other aspects of the Offerings." Joint App'x 1801. This was so even though Section 1301 obliged the Board to "determin[e] whether the dollar amount of [s]hares sold in the Offerings was at least $100 million." Joint App'x 1801. As we read it, the District Court determined that while the Board *could* have used a certain methodology to calculate the dollar value of the Class B Shares sold, it missed the mark completely—and, thus, manifestly erred—when it instead calculated the change in shareholders' equity at an aggregate level to determine that the sale of a certain value of equity led to an over $100 million impact on the balance sheet. But the Board never calculated whether the value of the equity sold was itself at least $100 million, as Section 1301 of the Indenture plainly required.

While we hold only that the Board manifestly erred under New York law in the limited context of the valuation determination in *this case*, the concurrence

13

broadly asserts that the Board violated the Indenture's terms by failing to sell the shares in a "public offering." Sullivan, *J.*, Concurring Op., *post* at 1. The New York Court of Appeals, says the concurrence, would describe the Recapitalization Support Agreement and Notes Exchange Offers in this case as private "sales" rather than agreements for potential buyers to participate in a later public offering, which are "common[place] in global securities offerings." *See* Joint App'x 1745. That might be right if the issue before us involved substantive federal law. As the concurrence suggests in citing to *Chatham Cap. Holdings v. Conru*, 92 F.4th 107, 114 (2d Cir. 2024), where we interpreted the term "public offering" within the meaning of the Securities Act, 15 U.S.C. § 77d(a)(2), a "public offering" as distinct from a private offering or sale has a long-established meaning under the federal securities laws.

The problem with the concurrence's analysis is that the Indenture is governed by New York law, not federal law. Joint App'x 1029–30; *see Bank of New York Tr. Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013). As even our concurring colleague acknowledges, our task on appeal is to determine whether the Board "manifest[ly] err[ed]" under *Hermance*, 71 N.Y. at 486. But New York law itself tells us that "there is no controlling New York authority

14

establishing what constitutes a public offering." *People v. Landes*, 84 N.Y.2d 655, 661 (1994). Although we recognize that the Indenture leaves it to the Board to determine whether and when a "Qualified Public Offering Threshold" occurred, Joint App'x 1657–58, we are doubtful that the Board committed an incontrovertible error when it interpreted a term that New York law has never defined. Holding otherwise is decidedly *not* "a narrower ground on which to resolve this appeal." *See* Sullivan, J., Concurring Op., *post* at 4.

To resolve this appeal, we need not guess how the State of New York would define the meaning of "public offering." The difference between a "public offering" and a private sale received little attention from the parties, *see* Appellees' Br. 23–25; Appellant's Reply Br. 14–17, and was sidestepped by the District Court entirely, *see* Joint App'x 1800 n.15. It would be imprudent to embrace such an uncertain issue of state law, much less to presume that state law mirrors federal law for these purposes. Because we can resolve the appeal otherwise, we decline to do so.

**CONCLUSION**

We have considered GCDI's remaining arguments and conclude that they are without merit. For the foregoing reasons, the judgment of the District Court is AFFIRMED.

RICHARD J. SULLIVAN, *Circuit Judge*, concurring:

Although I agree with the majority's ultimate outcome, I arrive there by a slightly different – and more direct – route. In my view, the principal problem raised by this appeal is not the method of valuation employed by GCDI's Board of Directors; it is, rather, the lack of a *public* offering with respect to (i) the 39 million shares covered by the August 2019 Amended and Restated Recapitalization Support Agreement ("RSA") that was privately negotiated with PointArgentum and IRSA and (ii) the November 2019 Notes Exchange Offer that was made available only to existing noteholders. *See* Maj. Op. at 4–5; J. App'x at 1742, 1745. To my mind, neither sale meets any reasonable definition of a public offering.

As the majority points out, the Indenture "required that 'at least U.S. $100,000,000 of Common Shares (and/or other equity interests) be sold' in 'public offerings' to trigger the mandatory conversion." Maj. Op. at 9 (alterations accepted) (quoting J. App'x at 1657–58). More specifically, the Indenture obliged "the Company [to] proceed[] with one or more public offerings . . . *in which*, cumulatively and in the aggregate *for such offerings*, at least U.S. $100,000,000 of its Common Shares . . . are sold by the Company." J. App'x at 1657–58 (emphasis added). And while neither the Indenture, *see id.* at 1657–59, nor New York law, *see*

*People v. Landes*, 84 N.Y.2d 655, 661 (1994), expressly defines the term "public offering," we all agree that the phrase must be interpreted in such a way as "to give effect to the parties' expressed intentions based on the plain meaning of the agreement's terms." Maj. Op. at 8 (citing *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244–45 (2014); *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94–95 (2d Cir. 2021)).

The ordinary meaning of "public offering" is straightforward: it is "[a]n offering made to the general public." Black's Law Dictionary 1304 (11th ed. 2019). Unsurprisingly, when interpreting "public offering" under federal law, we have held that "[i]n general, a limited distribution to highly sophisticated investors, rather than a general distribution to the public, is not a public offering." *Chatham Cap. Holdings v. Conru*, 92 F.4th 107, 114 (2d Cir. 2024) (internal quotation marks omitted).

Applying the plain meaning of public offering here, I cannot see how any portion of the 39 million shares delivered pursuant to the RSA – or those converted pursuant to the Notes Exchange Offer – could be deemed to be part of the public offering required to trigger the conversion in the Indenture. Both transactions were privately structured exchanges with a defined and "limited" set of "highly

2

sophisticated" counterparties; they were not securities offered to the investing public at large. *Id.* (internal quotation marks omitted). Indeed, the Board's *own counsel* recognized that while all classes of GCDI's securities were made available to the public for purchase, the vast majority "were not" sold in the December public offer, as was required for automatic conversion, because a large part of GCDI's "securities *were sold in large part pursuant to the* [earlier, privately placed] *Notes Exchange Offer*." J. App'x at 1745 (emphasis added). The "Notes Exchange Offer," counsel further conceded, "was conducted in the United States on a private placement basis." *Id.* at 1742. It was, in other words, a "private offering," which is generally taken to mean "[a]n offering made only to a small group of interested buyers," and not an "offering made to the general public." Black's Law Dictionary 1304 (11th ed. 2019); *accord Chatham Cap. Holdings*, 92 F.4th at 114.

As was the case in *Chatham Capital Holdings*, the RSA here "involved a limited distribution" that was made available "*only* to preexisting [GCDI] investors who held preexisting [GCDI] notes." *Compare* 92 F.4th at 114 (emphasis added), *with* J. App'x at 1745 (detailing prerequisites for investors to participate in GCDI's Notes Exchange Offer). In addition, "[b]efore offerees could participate, each had to warrant that it was an experienced investor." *Chatham Cap. Holdings*,

3

92 F.4th at 114. That is, "[t]he Notes Exchange Offer . . . was only offered to certain eligible holders of the Notes, *who were able to certify* that they were" qualified institutional buyers, accredited investors, or non-U.S. persons or entities. J. App'x at 1745 (emphasis added). In short, the Board's "incontrovertible" error, Maj. Op. at 9 (quoting *Hermance v. Bd. of Supervisors*, 71 N.Y. 481, 486 (1877)), was treating a quintessentially private offering as a public one, *see* J. App'x at 1742.

Though the district court did not pass on this line of argument below, *see id.* at 1800 n.15, I believe this approach – as opposed to a general critique of the Board's valuation method, which the majority concedes "might conceivably have" worked under different circumstances, Maj. Op. at 13 (quoting J. App'x at 1806) – is a narrower ground on which to resolve this appeal. After all, *Hermance* – which governs our review of the Board's decision, *id.* at 7–8 – forbids "courts from second-guessing 'all errors of judgment, errors of fact, errors of law, and jurisdictional questions,'" *id.* at 7 (alteration adopted) (quoting *Hermance*, 71 N.Y. at 485). Because the question of whether an offering was public or private is less likely to degenerate into a debate about "errors of judgment," *id.* (quoting *Hermance*, 71 N.Y. at 485), I would affirm the district court's judgment on this distinct ground.

The majority disagrees, insisting "that the Board can[not] be said to have committed an incontrovertible error when it interpreted a term [*i.e.*, public offering] that New York law has never defined."  Maj. Op. at 15.  But that logic strains credulity:  if the Board were to have determined that it made a "public offering" by simply nailing a for-sale sign to an electrical post on a public sidewalk in the suburbs of Buenos Aires, we would not hesitate to find an incontrovertible error – notwithstanding that "'there is no controlling New York authority establishing what constitutes a public offering.'"  *Id.* (quoting *Landes*, 84 N.Y.2d at 661).  The fact that New York's Court of Appeals has yet to define the precise contours of the term does not absolve us of the duty to interpret the contract before us – nor is there reason to believe that New York courts would be inclined to jettison reason, common sense, and plain meaning when interpreting a straightforward term like "public offering."  *See Donohue v. Cuomo*, 38 N.Y.3d 1, 13 (2022) (recognizing that, "[under] New York law, 'a written agreement that is complete, clear and unambiguous on its face *must* be enforced according to the *plain meaning* of its terms'" (alteration adopted and emphases added) (quoting *Kolbe v. Tibbetts*, 22 N.Y.3d 344, 353 (2013))).

5

Because the RSA and Notes Exchange Offer fall well beyond any conceivable definition of a "public offering," I would affirm the district court's judgment on that ground without wading into the muddier waters of valuation methods.